UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

VICTOR GABOURY,                       :
          Plaintiff,                  :
                                      :
      v.                              :     CA 08-319 ML
                                      :
MICHAEL J. ASTRUE,                    :
Commissioner of Social Security, :
          Defendant.                  :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter is before the Court on the request of Plaintiff Victor Gaboury ("Plaintiff") for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Disability Insurance Benefits ("DIB"), under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act"). Plaintiff has filed a motion to reverse the decision of the Commissioner. See Plaintiff's Motion to Reverse without or, Alternatively, with a Remand for a Rehearing the Commissioner's Final Decision (Document ("Doc.") #6) ("Motion to Reverse"). Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the Commissioner's decision. See Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. #7) ("Motion to Affirm").

This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I find that the Commissioner's determination that Plaintiff is not disabled is not supported by substantial evidence in the record. Accordingly, based on the following analysis, I recommend that Plaintiff's Motion to Reverse be granted and that Defendant's

Motion to Affirm be denied.

## Facts and Travel

Plaintiff was born in 1968, (Record ("R.") at 19, 30, 86, 137), and was thirty-nine years old at the time of the hearing before the Administrative Law Judge ("ALJ"), (R. at 31).  He received his GED, (R. at 19, 31, 103), is able to communicate in English, (R. at 19), and has past relevant work experience as a rubbish collector, a janitor, and an estate cleaner, (R. at 19, 32, 99, 147).

Plaintiff filed an application for DIB on April 22, 2006, (R. at 11, 86-88), alleging disability since February 14, 2005, (R. at 11, 86, 98), due to degenerative disc disease, (R. at 98). The application was denied initially, (R. at 11, 46, 50-52), and on reconsideration, (R. at 11, 47, 54-56), and a request for a hearing before an ALJ was timely filed, (R. at 11, 59).  A hearing was held on January 23, 2008, at which Plaintiff, accompanied by a non-attorney representative, appeared and testified, as did an impartial medical expert, Louis A. Fuchs,[1] M.D. (the "ME"), and an impartial vocational expert, Kenneth R. Smith (the "VE").  (R. at 11, 21-45, 81)  On February 29, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. at 11-20)  Plaintiff requested review by the Appeals Council, (R. at 6), which on April 9, 2008, denied his request, (R. at 1-3), thereby rendering the ALJ's decision the final decision of the Commissioner, (R. at 1).  Plaintiff thereafter filed this action for judicial review.

## Issue

The issue for determination is whether the decision of the

---

[1] In the transcript of the January 23, 2008, hearing, Dr. Fuchs' name is spelled "Fukes."  (R. at 21-25, 30)  The Court uses the correct spelling, (R. at 76), as did the ALJ in his decision, (R. at 11, 18).

Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

### Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed de novo, the Commissioner's findings of fact, if supported by substantial evidence in the record,[2] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)).  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426 (1971))).

### Law

To qualify for DIB, a claimant must meet certain insured

---

[2] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

status requirements,[3] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act.  See 42 U.S.C. § 423(a).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...."  42 U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[4]  20 C.F.R. § 404.1521(a) (2009).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a) (2009).

The Social Security regulations prescribe a five step

---

[3] The ALJ found that "[t]he claimant last met the insured status requirements of the Social Security Act on June 30, 2007."  (R. at 13)

[4] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b) (2009).  Examples of these include:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2)  Capacities for seeing, hearing, and speaking;
> (3)  Understanding, carrying out, and remembering simple instructions;
> (4)  Use of judgment;
> (5)  Responding appropriately to supervision, co-workers and usual work situations; and
> (6)  Dealing with changes in a routine work setting.

Id.

inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a) (2009); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform his past relevant work; and (5) whether he remains capable of performing any work within the economy.  See 20 C.F.R. § 404.1520(b)-(g).  The evaluation may be terminated at any step.  See Seavey, 276 F.3d at 4.  "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met h[is] burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

### ALJ's Decision

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of February 14, 2005, through his date last insured of June 30, 2007, (R. at 13); that Plaintiff's back disorder caused more than a slight impairment in occupational functioning and was, therefore, a "severe" impairment, (id.); that, nonetheless, Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (R. at 14); that Plaintiff retained the residual functional capacity ("RFC") to perform a wide range of sedentary work, with the

nonexertional limitations of a need to stand for as much as five minutes each hour, an inability to work at unprotected heights and around dangerous machinery or automotive equipment, and a moderate limitation in his ability to maintain attention and concentration such that he was able to maintain concentration and attention sufficient to perform simple work tasks for an eight hour work day, assuming short work breaks on average every two hours, (id.); that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible, (R. at 18); that Plaintiff was unable to perform his past relevant work, (R. at 19); that, considering his age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which Plaintiff could perform, (id.); and that, therefore, Plaintiff was not under a disability as defined in the Act at any time from February 14, 2005, his alleged onset date, through June 30, 2007, his date last insured, (R. at 20).

**Error Claimed**

Plaintiff alleges that: (1) the ALJ failed to evaluate accurately Plaintiff's severe, disabling pain; (2) the ALJ failed to evaluate appropriately the expert medical opinion of treating pain management physician Edward Kent. M.D.; (3) the ALJ failed to evaluate appropriately the expert medical opinion of treating primary care physician Paul Barratt, M.D.; and (4) the Appeals Council erred in ruling that new and material evidence submitted after the ALJ's decision did not provide a basis for changing the decision.  The Court addresses each of Plaintiff's contentions, albeit in different order.

**Discussion**

**I.    The ALJ's Evaluation of the Opinions of Plaintiff's Treating Physicians**

Plaintiff argues that the ALJ failed to evaluate

6

appropriately the opinions of Plaintiff's treating physicians,
Edward Kent, M.D., a pain management specialist, and Paul
Barratt, M.D., Plaintiff's primary care physician, in violation
of 20 C.F.R. § 404.1527(d).  See Plaintiff's Memorandum in
Support of Plaintiff's Motion to Reverse without a Remand for a
Rehearing or, Alternatively, with a Remand for Rehearing the
Commissioner's Final Decision ("Plaintiff's Mem.") at 13, 15.
Specifically, Plaintiff contends that the ALJ failed to make a
finding as to the degree of weight provided to each opinion, see
Plaintiff's Mem. at 14-15, and failed to evaluate accurately the
opinions, see id.

Section 404.1527(d) provides in relevant part that:

> Generally, we give more weight to opinions from your
> treating sources, since these sources are likely to be
> the medical professionals most able to provide a
> detailed, longitudinal picture of your medical
> impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of
> individual examinations, such as consultative
> examinations or brief hospitalizations. If we find that
> a treating source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other
> substantial evidence in your case record, we will give it
> controlling weight.  When we do not give the treating
> source's opinion controlling weight, we apply the factors
> listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this
> section, as well as the factors in paragraphs (d)(3)
> through (d)(6) of this section in determining the weight
> to give the opinion.  We will always give good reasons in
> our notice of determination or decision for the weight we
> give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2) (2009); see also Social Security
Ruling ("SSR") 96-2p, 1996 WL 374188, at *2 (S.S.A.) (listing
requirements for giving controlling weight to treating source's
opinion); id. at *5 ("[T]he notice of the determination or

decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). An ALJ is directed to consider the existence of an examining relationship, the existence of a treating relationship, the length, nature, and extent thereof, the supportability of an opinion, the consistency of an opinion with the record as a whole, the specialization of the source, and any other factors which the claimant brings to the adjudicator's attention. See 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ discussed the medical evidence pertaining to Plaintiff's back impairment as follows:

> The claimant has a back disorder. A June 16, 2004, MRI evidenced degenerative disc disease with L4-5 and T11-12 disc desiccation, a small left T11-12 and central L5-S1 disc protrusion without significant impingement, and a right L4-5 paracentral disc protrusion with mild to moderate thecal sac indentation [R. at 252-54]. South County Internal Medicine[5] noted on February 10, 2005, that the claimant cited lower back pain without sciatica [R. at 250]. On April 9, 2005, he reported an injury at work eight years earlier with worsening and quite incapacitating back pain and occasional not too severe leg pain [R. at 201]. He denied any significant relief with treatment with daily pain at a 5-6/10 that often reached a 9 or 10/10. He had good extremities tone of bulk, no pronator drift, 5/5 strength, normal sensation and gait, symmetric deep tendon reflexes, non-focal and intact cerebellar testing, normal finger-to-nose testing, and a markedly decreased lumbosacral range of motion due

---

[5] The Court notes that Plaintiff's primary care physician, Dr. Barratt, is a practitioner at South County Internal Medicine. See, e.g., (R. at 244) Accordingly, the examination notes ascribed to South County Internal Medicine are Dr. Barratt's notes.

to mild spasm and pain.   Dr. Doberstein[6] assessed
incapacitating back pain that was likely from L4-5 disc
degeneration.   A June 21, 2005, examination at South
County Internal Medicine revealed decreased spinal range
of motion with pain and spasm and sacroiliac tenderness.
South County Hospital discharge records of October 26,
2005, indicated that the claimant underwent a lumbar
laminectomy and discectomy [R. at 164].   Rhode Island
Hospital emergency department noted on November 14, 2005,
that the claimant was transferred from South County
Hospital for a lumbar wound exploration, CSF leak repair,
and lumbar drain placement [R. at 176].   He had 5/5
strength, intact sensation, no active lumbar wound
drainage, minimal erythema, and a non-focal neurologic
exam.   On November 7, 2005, Martina Schulz, PA-C,[7]
reported that the claimant was doing well post
operatively with a new mild pain down the right leg [R.
at 196-97].   An examination revealed good extremities
tone of bulk, no pronator drift, 5/5 strength, normal
sensation and gait, intact and non-focal cerebellar
testing, decreased lumbar range of motion, normal finger-
to-nose testing, and a healing surgical incision.   South
County Internal Medicine noted on December 8, 2005, that
the claimant had decreased back pain, improved mobility,
and an ability to get around without a cane.   On December
9, 2005, the claimant felt better with improving back
pain and no new numbness or weakness.   An examination
revealed no CSF leakage or wound infection, good tone of
bulk in the extremities, no pronator drift, 5/5 strength,
normal sensation and gait, non-focal and intact
cerebellar testing, decreased lumbosacral range of motion
due to mild spasm and pain, and normal finger-to-nose
testing.   Dr. Doberstein opined the claimant was
continuing to recover well.

South County Internal Medicine indicated on December 19,
2005, that the claimant should remain out of work until
cleared by neurosurgery and January 9, 2006, the back was
healed and looked "OK" [R. at 296].   A February 17, 2006,
x-ray evidenced a posterior L4-S1 fusion with no sign of
hardware failure [R. at 303].   South County Internal

--------

[6] Curtis E. Doberstein, M.D., a neurosurgeon, performed
Plaintiff's back surgery on October 26, 2005.   (R. at 193)

[7] Martina Schulz, PA-C, signed the report on behalf of Dr.
Doberstein.   (R. at 197)

Medicine noted on February 22, 2006, that the claimant was starting physical therapy the next day if his cold was better. Christopher Fries, PA-C,[8] stated on February 23, 2006, that the claimant was doing pretty well postoperatively with regard to the infection but complained of fairly constant low back pain into the right buttock and leg with occasional leg weakness [R. at 193-94]. An examination revealed good extremities tone of bulk, no pronator drift, 5/5 strength, a normal gait, mildly decreased lumbosacral range of motion due to spasm, a healed incision, and normal finger-to-nose testing. X-rays evidenced an incorporating L5-S1 fusion and transitioning pedicle screws into the vertebral bodies with the remainder of the lumbosacral spine in good alignment. Mr. Fries recommended physical therapy. A March 6, 2006, MRI evidenced some marrow edema in the L3 pars that was likely related to abnormal mechanics from the L4-S1 fusion; a small recurrent L4-5 disc that minimally indented the thecal sac and was smaller than previously; a prominent enhancing epidural fibrosis that did not create a mass effect on the right L5-S1 canal with no large disc protrusion; and an unchanged small L3-4 and T11-12 disc protrusion [R. at 291]. South County Internal Medicine noted on April 18, 2006, that the claimant felt that his pain was no better despite physical therapy twice a week. By May 1, 2006, he had ceased physical therapy as he was unable to do the exercises and disbanded his business. The examiner discussed narcotic pain medication addiction and suggested a Methadone clinic for better pain control. On May 12, 2006, the claimant cited persistent low back pain that was similar to pre-surgery [R. at 296-97]. An examination revealed good extremities tone of bulk, no pronator drift, 5/5 strength, a somewhat antalgic gait with a forward stooped posture, decreased lumbosacral range of motion due to discomfort and mild spasm, normal finger-to-nose testing, and a well healed incision. Dr. Doberstein stated that a recent MRI and CT evidenced no significant disc herniation or stenosis with the hardware in good position, the fusion incorporating well, and prominent scar tissue particularly at L4-5. He advised lumbar epidural steroid injections. South County Internal Medicine noted on May 31, 2006, that the claimant had canceled the injection due to an eye infection and had ceased physical therapy as it did not

---

[8] See n.7.

help [R. at 329].   The examiner recommended tapering Percocet and suggested a pain clinic but the claimant wanted to try injections first.

On August 22, 2006, Joseph Callaghan, M.D., a non-examining source, assessed lumbar degenerative disc disease and a history of headaches that limited the claimant to light exertion with four hours of standing and/or walking in an 8-hour workday; occasional balancing, stooping, kneeling, climbing of ramp/stairs, and right leg pushing/pulling with no crouching, crawling or climbing of ladders/ropes/scaffolds; and an inability to work at unprotected heights or to control hazardous equipment due to lumbar degenerative disc disease and chronic opioid analgesic use [R. at 305-12].   South County Internal Medicine noted on October 25, 2006, that there were ongoing concerns about the claimant's narcotic use but it was re-filled [R. at 352].   On November 12, 2006, Edward Kent, M.D., stated that the clamant had no improvement with three epidurals and had signs of facet joint pain [R. at 355].   He opined on December 14, 2006, the claimant had a failed back surgery syndrome/fusion and a facet joint spine syndrome with back pain and stiffness despite treatment [R. at 313].   On January 9, 2007, Amir Missaghian, M.D., a non-examining source, reviewed the evidence and affirmed the August 22, 2006, assessment [R. at 312, 361].

On January 17, 2007, and February 28, 2007, MIA Imaging Network performed lumbar nerve blocks [R. at 368].   Forms by Dr. Kent dated April 2, 2007, opined that the claimant could sit and stand/walk less than one hour each in an 8-hour workday; had to alternate positions; could perform fine manipulation and simple grasping but no upper extremities pushing/pulling or repetitive tasks or repetitive operation of foot controls; could never lift, carry or work at unprotected heights or around moving machinery; could occasionally climb and balance but never stoop, kneel, crouch, crawl or reach above shoulder level; and had a severe limitation in driving and a moderate limitation in being exposed to marked changes in temperature and humidity and being exposed to dust, fumes, and gases; however, he felt that physical therapy should be completing the form [R. at 364].   He opined pain disabled the claimant from even full-time sedentary work and impaired sustained attention and

concentration.[9] [R. at 364]  On April 18, 2007, Pradeep Chopra, M.D.,[10] reported that the claimant cited worsening lower lumbar pain for about ten years without radiation or radiculopathy that affected quality of sleep [R. at 373-74].  The claimant had an antalgic gait with forward flexion and he denied loss of strength, extremities stiffness or poor exercise tolerance.  An examination revealed good coordination, normal finger-to-finger, an ability to walk on heels and toes, 5/5 lower extremities strength, intact sensation, negative straight leg raising and Romberg, a positive Patrick's and lower lumbar facet loading, and lumbar spasms.  Dr. Chopra diagnosed low back pain, a myofascial pain syndrome, SI joint dysfunction, and a lumbar facet joint syndrome.  He recommended trigger point injections followed by stretching exercises.

On May 10, 2007, Paul Barratt, M.D., completed forms that opined the claimant had chronic severe back pain th[at] pre[v]ented even full-time sedentary work and severe[ly] limited attention and concentration.  [R. at 378-79]  South County Internal Medicine noted on June 4, 2007, that the claimant cited back pain with decreased range of motion, paraspinous spasm, and tenderness of the lumbar vertebral and SI region [R. at 455].  On June 29, 2007, Gerhard Friehs, M.D.,[11] reported that the claimant cited slowly increasing back pain for about ten years that had not improved with surgery [R. at 446-47].  The claimant

---

[9] Dr. Kent noted as "Additional Comments" that Plaintiff had

[f]ailed back surgery, [f]ailed epidural steroids, failed medial branch block for facet joint pain, [f]ailed Lyrica, [f]ailed Cymbalta [secondary to central nervous system] changes.
    This man has young children + can['']t function or really enjoy life[,; ] he walks very stiff + leaning.  I have discussed being eval[uated] by Dr. [Pradeep] Chopra for a 2nd opinion + by Dr. Ge[r]har[d] Fri[ehs] for a possible morphine pump [or] spinal cord stimulator – He is miserable and I hope I am never like him.

(R. at 363)  In a November 12, 2006, letter to Dr. Doberstein, Dr. Kent wrote of Plaintiff: "He feels like an old man and walks like one."  (R. at 367)

[10] See n.9.

[11] See n.9.

12

stated that he had generalized aches, tingling, weakness, disc problems, and sleeplessness.  Dr. Friehs diagnosed unspecified neuralgia, neuritis, and radiculitis with a forward stooped posture, an ability to walk on heels and toes, 5/5 strength, normal and symmetric extremities tone and trophism, occasional dysesthesias and paresthesias in the legs, an ability to move all extremities without difficulty, and lumbar tenderness and pain.  On July 17, 2007, Gary L'Europa, M.D.,[12] reported that nerve conduction studies and an EMG were normal [R. at 448]. A July 30, 2007, MRI evidenced a marrow edema-like signal in the region of the pars at L3 with little interim change and a slight progression in the L3-4 stenosis with a relatively unchanged small disc protrusion [R. at 497-98].  A July 31, 2007, CT revealed degenerative and post operative changes, unchanged epidural fibrosis on the right L5-S1, and some erosion along the posterior lateral margin of the right L5 vertebral body that was similar to the prior.  South County Internal Medicine noted on September 27, 2007, that the claimant denied weakness and joint pain or stiffness.  The examiner discussed getting a sedentary job but the claimant stated that he could only sit 45 minutes before he had to lie down due to back pain.  The claimant was well-developed with full joint range of motion and normal motor, reflexes, joints, and muscles on examination.  On October 26, 2007, Dr. Friehs stated that the claimant had a forward stooped posture, an ability to walk on heels and toes, 5/5 extremities strength, normal and symmetrical extremities tone and trophism, occasional dysesthesias and paresthesias in the legs, an ability to move all extremities without difficulty, and lumbar spine pain and tenderness. [R. at 493]  A 2007 MRI and CT evidenced a fusion with L4-S1 instrumentation, good hardware placement, and moderate L3-4 spinal stenosis. Dr. Friehs recommended intrathecal morphine therapy. [R. at 494]  South County Internal Medicine noted on November 15, 2007, that the claimant cited back pain and wanted to change from Percocet to OxyContin; however, the examiner recommended remaining on Percocet so these could be ceased faster when he obtained the pump.

(R. at 15-18)

    After addressing the issue of Plaintiff's credibility, the

---

[12] Dr. Friehs referred Plaintiff to Dr. L'Europa.  (R. at 448)

13

ALJ described the testimony of the ME at the January 23, 2008, hearing:

> Louis Fuchs, MD, Board-certified in orthopedic surgery and recognized by the Commissioner as an impartial medical expert, reviewed the entire medical record and appeared at the claimant's hearing.  He testified that the record does not support a conclusion that the claimant has an impairment which meets or equals in severity the requirements of any listing.  He observed that on multiple examinations the claimant was neurologically intact, but opined that he would be restricted in the ability to kneel, lift, and bend such that he could perform a range of sedentary work only.  Dr. Fuchs' testimony, and in particular his functional assessment, is fully consistent with the conclusions reached herein.

(R. at 18)   The ALJ concluded:

> Thus, the Administrative Law Judge finds that the claimant has a back disorder that was treated with an L4-S1 fusion with post operative complications of a wound infection and CSF leak that required repair; however, since the surgery, most examinations evidenced that he was neurologically "intact" per the testimony of the impartial medical expert.  The Administrative Law Judge finds that the claimant does have pain and limited range of motion; therefore, the claimant would be limited to sedentary exertion, which is consistent with the testimony of the impartial medical expert and the evidence of record.  It is noted that South County Internal Medicine noted multiple times that there were concerns about the claimant's narcotic medication use and he was encouraged to taper the medication and go to a pain clinic, which the claimant failed to do[,][13] but the examiner continued to prescribe the medications as the claimant was receiving treatment.

(R. at 18)

Based on the Court's own review of the record, the quoted portion of the ALJ's decision appears to be an accurate summary of the medical evidence.  However, nowhere does the ALJ state

---

[13] See Discussion section II infra at 22-23.

what weight he gave to the opinions of the various physicians expressed therein.  It is apparent that he credited the opinion of the ME, Dr. Fuchs, but the ALJ does not state the weight given to that opinion or to the opinions of Drs. Kent and Barratt, whose evaluations are virtually identical, nor does he appear to have considered the factors listed in 20 C.F.R. § 404.1527(d).

For example, it is not clear whether the ALJ realized that Dr. Kent's specialty is pain management, (R. at 362), or that the reports from Dr. Barratt and South County Internal Medicine were from the same source, (R. at 15-18).[14]  In addition, the ALJ makes no mention of the length of the treating relationship between the doctors and Plaintiff, particularly with regard to Dr. Barratt with whom Plaintiff treated for several years, (R. at 207-94, 314-58, 376-445, 455-92), or the frequency of Plaintiff's visits, (id.).

The Court recognizes that the Commissioner is entitled to give greater weight to the opinion of his own medical expert. See Coggon v. Barnhart, 354 F.Supp.2d 40, 54 (D. Mass. 2005)("The Commissioner may also place greater weight on the report of its

---

[14] Among the reasons given by the ALJ for finding Plaintiff's statements concerning the severity of his pain not entirely credible were: "Despite South County Internal Medicine recommending that the claimant go to a pain clinic, he did not and this is also inconsistent with an individual seeking relief of the severe pain alleged."  (R. at 18)  The ALJ's reference is to a May 31, 2006, office note by Dr. Barratt which states: "discussed chronic pain and getting to pain clinic, wants to try epidurals first; also discussed tapering off the percocet[]s."  (R. at 329)  In drawing an adverse inference from the fact that Plaintiff did not go to a pain clinic, the ALJ appears to have overlooked (or failed to appreciate) that Plaintiff began treating with a pain management specialist, Dr. Kent, (R. at 297), on June 9, 2006, (R. at 313), and that Plaintiff had been specifically referred to Dr. Kent by Dr. Doberstein, Plaintiff's neurosurgeon, on May 12, 2006, (R. at 297).  Thus, the referral to Dr. Kent preceded Dr. Barratt's suggestion that Plaintiff go to a pain clinic.  Given these circumstances, the fact that Plaintiff sought treatment for his pain from Dr. Kent—and did not go to a pain clinic—is not inconsistent with an individual seeking relief of severe pain.

medical expert.")(citing <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 n.1 (1st Cir. 1988)("It is within the [Commissioner's] domain to give greater weight to the testimony and reports of medical experts who are commissioned by the [Commissioner]."); <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 130 (1st Cir. 1981)). However, he must state the weight afforded to the medical opinions in the record, <u>see</u> 20 C.F.R. § 404.1527(d), explain his reasons, <u>see id.</u>, and be sufficiently specific to make clear to subsequent reviewers such as this Court what weight was given to those opinions and why, <u>see</u> SSR 96-2p, 1996 WL 374188, at *5. In the instant matter, the ALJ failed to do so. Therefore, the Court finds that the ALJ violated 20 C.F.R. § 404.1527(d) and SSR 96-2p.

Defendant argues that "it is clear that the ALJ afforded controlling weight to the impartial medical expert's opinion that Plaintiff could perform sedentary work with a sit/stand option over the overly restrictive and unsupported opinions of Plaintiff's treating sources." Defendant's Memorandum of Law in Support of Motion for an Order Affirming the Decision of the Commissioner ("Defendant's Mem.") at 16-17. This the ALJ cannot do. In order to be afforded controlling weight, "[t]he opinion must come from a 'treating source,' as defined in 20 CFR [§] 404.1502 ...." SSR 96-2p, 1996 WL 374188, at *2; <u>see also id.</u> ("Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to 'controlling weight.'"). The ALJ was required to follow the dictates of SSR 96-2p.<sup>15</sup>

---

<sup>15</sup> Social Security rulings are binding on all Social Security Administration personnel, including ALJs and the Appeals Council. <u>McDonald v. Sec'y of Health & Human Servs.</u>, 795 F.2d 1118, 1125 (1st

Accordingly, I find that the matter should be remanded to the Commissioner for further administrative proceedings, namely evaluation of the medical opinions of Drs. Barratt and Kent in accordance with 20 C.F.R. § 404.1527(d) and SSR 96-2p,[16] and for a clear statement as to the weight given to their opinions and the opinion of the ME.  I so recommend.

## II.  The ALJ's Evaluation of Plaintiff's Pain

Plaintiff argues that the ALJ failed to assess accurately Plaintiff's allegations of "[s]evere, [d]isabling [p]ain ...." Plaintiff's Mem. at 5.  The ALJ found that Plaintiff's "medically determinable impairment could have been reasonably expected to produce some symptoms of the type alleged, but that the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible."  (R. at 18); see also (id.)("While the Administrative Law Judge finds that the claimant has an impairment, the record does not support the degree of limitation alleged.").

 An ALJ is required to investigate "all avenues presented that relate to subjective complaints ...." Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28 (1st Cir. 1986).  In addition, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A.). When assessing the credibility of an individual's statements, the

_____

Cir. 1986); see also 20 C.F.R. § 402.35 (2009).

    [16] To reiterate, the Commissioner may, as noted above, afford greater weight to the opinion of the ME than to those of Plaintiff's treating physicians.  However, he must state the weight given to the opinions and explain his reasoning.

ALJ must consider, in addition to the objective medical evidence, the following factors:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; see also Avery, 797 F.2d at 29 (listing factors relevant to symptoms, such as pain, to be considered); 20 C.F.R. § 404.1529(c)(3) (2009) (same). The ALJ's credibility finding is generally entitled to deference, especially when supported by specific findings. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)); see also Yongo v. INS, 355 F.3d 27, 32 (1st Cir. 2004)("[T]he ALJ, like any fact-finder who hears the witnesses, gets a lot of deference on credibility judgments."); Suarez v. Sec'y of Health & Human Servs., 740 F.2d 1 (1st Cir. 1984) (stating that ALJ is "empowered to make credibility determinations ...").

Plaintiff first contends that the ALJ's evaluation of Plaintiff's daily activities is factually erroneous. Plaintiff's Mem. at 6. Plaintiff cites several statements in the ALJ's

18

decision in support of this argument.  Id. at 6-9.

Plaintiff asserts that the ALJ's statement that Plaintiff is capable of managing his finances is inaccurate and unsupported by the record.  Id. at 6 (citing (R. at 19)).  There was no testimony at the hearing regarding Plaintiff's ability to handle finances.  (R. at 30-41)  In an activities of daily living form completed on May 18, 2006, Plaintiff denied that he handled his own finances and affirmatively stated that his "wife has always handled the finances."  (R. at 107)  The only arguable support for the ALJ's finding that Plaintiff is "able to ... manage finances ...," (R. at 19), is a function report completed on December 11, 2006, in which Plaintiff indicated that he was able to pay bills, count change, handle a savings account, and use a checkbook or money orders, (R. at 131).

Plaintiff also complains about the ALJ's statement that Plaintiff was able to "do some housework ...."  (R. at 19); see also Plaintiff's Mem. at 7-8.  Plaintiff notes that he testified at the hearing that the most he was able to do was "fill up the dishes with water ...," (R. at 36), but that he did not wash the dishes or do any other type of housework, (id.); see also Plaintiff's Mem. at 7.  Plaintiff additionally notes that his testimony is consistent with forms he completed for Disability Determination Services ("DDS") during the administrative process. Plaintiff's Mem. at 7 (citing (R. at 106) ("I now rely on my wife and children to complete all of the household chores and yard work because I am unable to do the physical movements necessary ....")).  The Court agrees that the ALJ's finding that Plaintiff is to able to do "some housework," (R. at 19), is not supported by substantial evidence.

Plaintiff additionally disputes the ALJ's statement that Plaintiff could "cook simple foods ...," (R. at 19); see also Plaintiff's Mem. at 8 (citing, inter alia, Plaintiff's testimony

19

at the hearing); id. at 7-8 (citing (R. at 36)).  Plaintiff
testified as follows:

    Q    Do you prepare food for yourself?

    A    Lightweight food.  I don't cook anything.

(R. at 36)

    Given this testimony, it is possible that the ALJ intended
to state that Plaintiff could "prepare simple foods."  Viewed in
isolation, the ALJ's misstatement is insubstantial and would not
cause the Court concern.  Here, however, the Court has already
concluded that the ALJ's finding that Plaintiff is able to do
"some housework," (R. at 19), overstates matters.

    Plaintiff next contends that the ALJ erred in stating that
Plaintiff could "perform self-care ...."  Plaintiff's Mem. at 8
(citing (R. at 19)).  Plaintiff quotes forms he completed
describing his self-care:

> I sit on my bed while dressing due to severe weakness,
> fatigue, lack of balance, numbness in my feet and pain in
> my back and legs.  I experience increased pain in my back
> while bending to put on undergarments, pants and socks.
> I wear slip on shoes to avoid bending to tie my shoes.
> I now take my time while attempting to put shirts on in
> order to limit the amount of pain that I experience.  I
> hold onto the wall while showering due to severe
> weakness, fatigue, numbness in my feet and pain in my
> back and legs.  I use a long handle brush to[w]ash my
> lower extremities due to severe pain in my back while
> bending.  At times, I experience increased pain in my
> back while reaching up to wash my hair.  I now use an
> electric razor to shave my face to limit the amount of
> time and effort it takes me to shave my face.  I
> experience increased pain in my back while reaching
> around to cleanse myself after using the toilet.

(R. at 106); see also Plaintiff's Mem. at 8.  Plaintiff was asked
essentially no questions about self-care at the hearing.  (R. at
20-41)  Thus, it appears that the only basis for the ALJ's
finding that Plaintiff is able to perform self-care is the above

statement of Plaintiff.  While it is true that Plaintiff does not state that he requires assistance with self-care, the Court cannot agree that Plaintiff's ability to perform self-care as described above indicates that his pain is not as severe as he claims or that he is capable of full time employment.

Plaintiff contests the ALJ's statement that Plaintiff was able to "socialize with family ...."  (R. at 19); see also Plaintiff's Mem. at 9.  At the January 23, 2008, hearing, Plaintiff testified that he did not engage in social activities, go to church, or attend any of his children's school activities. (R. at 39-40)  When asked by the ALJ whether he "visit[ed] with friends or relatives at all[,]" (R. at 36), Plaintiff responded that "[s]ince before the, a little before the surgery.  I haven't.  No.  A little bit here and there but I always seem to have to leave," (id.).  In describing his daily activities in a Pain Questionnaire dated June 20, 2006, Plaintiff stated that "[a]fter dinner, I watch television and visit with my family." (R. at 110)  If this limited socialization within the family unit is the basis for the ALJ's finding that Plaintiff is able to "socialize with family," (R. at 19),—and the Court sees no other basis for such finding—it does not constitute substantial evidence to conclude that Plaintiff's pain is not as severe as he claims or that he is capable of full time employment.

Plaintiff additionally challenges the ALJ's credibility finding on the ground that the ALJ's evaluation of Plaintiff's compliance with medical treatment is not supported by substantial evidence.  Plaintiff's Mem. at 9.  Specifically, Plaintiff contends that the ALJ's examples of non-compliance "are either exaggerated or simply inaccurate[.]"  Id. at 10.  The Court is compelled to agree.

The ALJ found that:

The claimant was not entirely compliant with treatment as

> he delayed participating in physical therapy[,] then
> ceased it as he felt that his pain was no better.
> Despite South County Internal Medicine recommending that
> the claimant go to a pain clinic, he did not[,] and this
> is also inconsistent with an individual seeking relief of
> the severe pain alleged.

(R. at 18)  The record reflects that on February 23, 2006, Dr. Doberstein wrote that he was giving Plaintiff a prescription for physical therapy and that he would like Plaintiff to start as soon as possible.  (R. at 289)  Dr. Barratt's progress note of April 18, 2006, states that Plaintiff was doing physical therapy twice weekly.  (R. at 291)  Although the record does not contain the date Plaintiff started physical therapy, it can be inferred that it commenced prior to April 18, 2006.  Thus, if there was a delay, it was at most a matter of only a few weeks.

The ALJ also drew a negative inference from Plaintiff's decision to stop physical therapy.  (R. at 18)  Yet, the record reflects that Plaintiff reported to Dr. Barratt on April 18, 2006, that his pain was no better and that his leg muscles "twitch since PT started."  (R. at 291)  On physical examination Dr. Barratt found that Plaintiff's range of motion had decreased and that his movements were painful.  (Id.)  On May 1, 2006, Plaintiff told Dr. Barratt that his back pain was still severe and that physical therapy had made it worse.  (R. at 293)  There is no suggestion by Dr. Barratt or Dr. Doberstein (who referred Plaintiff to physical therapy) that Plaintiff's cessation of physical therapy was contrary to their medical advice or ill-advised.  (R. at 291, 293, 296-97)

With respect to the ALJ's finding that Plaintiff did not go to a pain clinic and that this was inconsistent with the severe pain which Plaintiff alleged, (R. at 18), the Court has already noted that the ALJ appears to have overlooked (or failed to

appreciate) significant evidence on this point.[17]  Plaintiff
began treating with Dr. Kent, a pain management specialist, (R.
at 297), on June 9, 2006, (R. at 313).  Dr. Kent is a diplomate
of both the American Board of Anesthesiology and the American
Board of Pain Management, (R. at 367), and Plaintiff had been
specifically referred to Dr. Kent by Dr. Doberstein on May 12,
2006, (R. at 297).[18]  Plaintiff's apparent decision to seek
treatment for his pain from Dr. Kent—and not go to a pain
clinic—is not inconsistent with an individual seeking relief of
severe pain.

The ALJ found that Plaintiff "cancelled an epidural steroid
injection due to an eye infection, which is not consistent with
an individual seeking relief of severe debilitating pain."  (R.
at 19)  The Court is unable to find that this statement is
supported by substantial evidence because the cancellation caused
no significant delay in treatment.  Plaintiff told Dr. Barratt on
May 31, 2006, that his "epidural last week [was] cancelled due to
eye infection."  (R. at 329)  Dr. Kent's June 23, 2006, progress
note reflects "repeat ESI today."[19]  (R. at 366)  Plaintiff's
previous visit (his first) to Dr. Kent was on June 9, 2006.  (R.
at 313)  Thus, it can be reasonably inferred that Plaintiff

---

[17] See n.14.

[18] Even if the ALJ had in mind Dr. Barratt's May 1, 2006,
suggestion that Plaintiff consider a "methadone clinic as option for
better pain control," (R. at 324), and not Dr. Barrett's May 31, 2006,
discussion of a "pain clinic," (R. at 329), a delay of little more
than five weeks (from May 1, 2006) until Plaintiff first saw Dr. Kent
is not significant, especially given the intervening contact on May
12, 2006, with Dr. Doberstein, (R. at 297).

[19] The June 23, 2006, date is not completely legible on Dr. Kent's
progress note.  (R. at 366)  However, it can be reasonably inferred
from another record, (R. at 313) (reflecting that Dr. Kent saw
Plaintiff on 6/9/06, 6/23/06, 7/28/06, and 11/10/06).

received his first epidural injection on June 9, 2006.[20]  (Id.)
This was only nine days after Dr. Barratt noted that the first
injection had been canceled due to a documented eye infection.[21]
Such minimum delay fails to support the ALJ's conclusion that the
cancellation "was not consistent with an individual seeking
relief of severe debilitating pain."  (R. at 19)

    The ALJ also stated that "[t]he claimant is not entirely
credible as he informed Dr. Doberstein that he had back pain
related to a work injury eight years earlier [R. at 201] but on
April 20, 2004, South County Internal Medicine noted that the
claimant stated that he bent over to pick up something light at
home and developed excruciating back pain [R. at 244]."  (R. at
18-19); see also Plaintiff's Mem. at 11-12.  Plaintiff contends
that the two statements "are entirely consistent with a history
of chronic back pain which became worse with a lifting injury in
April 2004," Plaintiff's Mem. at 12, because Plaintiff informed
Dr. Doberstein on April 9, 2005, that "[o]ver the past year or so
... his pain [was] progressively worsening ...," (R. at 201); see
also Plaintiff's Mem. at 11.  Defendant argues that Plaintiff
"simply offers an alternative interpretation of the evidence,"
Defendant's Mem. at 12, and that this Court must defer to the
ALJ's reasonable inferences "even if it would have reached a
different conclusion based on the same evidence," id.

    Under different circumstances, the Court would agree with
the Commissioner.  See Lizotte v. Sec'y of Health & Human Servs.,
654 F.2d 127, 128 (1st Cir. 1981)("[I]ssues of credibility and
the drawing of permissible inference from evidentiary facts are

---

[20] In a letter to Dr. Doberstein, Dr. Kent stated that the "three
epidurals ... were completed on 7/28/06."  (R. at 367)

[21] The eye infection was observed and documented by Dr. Barratt on
May 17, 2006, when Plaintiff sought treatment with him for a painful
and swollen right top eyelid.  (R. at 327)

the prime responsibility of the Secretary."). Here, however, the
ALJ's mistaken, unsupported (or barely supported), or overstated
findings with respect to Plaintiff's daily activities, ability to
perform self-care, and compliance with medical treatment
undermine his conclusion that Plaintiff's "statements concerning
the intensity, persistence[,] and limiting effect[] of these
symptoms are not entirely credible." (R. at 18) Accordingly, I
recommend that the matter also be remanded for a re-evaluation of
Plaintiff's subjective complaints of pain.

III. **The Appeals Council's Denial of Plaintiff's Request for
Review**

Lastly, Plaintiff contends that the Appeals Council erred in
ruling that new and material evidence submitted after the ALJ's
decision did not provide a basis for changing that decision.
Plaintiff's Mem. at 17 (citing <u>Mills v. Apfel</u>, 244 F.3d 1 (1st
Cir. 2001)). In <u>Mills</u>, the First Circuit held that "an Appeals
Council refusal to review the ALJ may be reviewable where it
gives an egregiously mistaken ground for this action." <u>Id.</u> at 5.
Here, the Appeals Council stated that it "found that this
information does not provide a basis for changing the
Administrative Law Judge's decision." (R. at 2)

This Court has recently addressed the same issue. In <u>Kirby</u>
<u>v. Astrue</u>, No. C.A. 07-422A, 2008 WL 2787926 (D.R.I. July 17,
2008), Magistrate Judge Lincoln D. Almond concluded that the
plaintiff, who argued that the Appeals Council had erred by
declining to remand based on additional evidence submitted after
the ALJ's decision, had not presented a reviewable issue. <u>Id.</u> at
*9. Judge Almond recognized that in general, the discretionary
decision of the Appeals Council to deny a request for review of
an ALJ's decision is not reviewable. <u>Id.</u> at *10.

> The First Circuit has, however, held that review of
> Appeals Council action may be appropriate in those cases
> "where new evidence is tendered after the ALJ decision."

25

Mills v. Apfel, 244 F.3d 1, 5 (1ˢᵗ Cir. 2001). In such cases, "an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action." Id. This avenue of review has been described as "exceedingly narrow." Harrison v. Barnhart, C.A. No. 06-30005-KPN, 2006 WL 3898287 (D. Mass. Dec. 22, 2006). Further, the term "egregious" has been interpreted to mean "[e]xtremely or remarkably bad; flagrant," Ortiz Rosado v. Barnhart, 340 F.Supp.2d 63, 67 (D. Mass. 2004) (quoting Black's Law Dictionary (7ᵗʰ ed. 1999)).

Here, the Appeals Council issued a "boiler plate" denial of Plaintiff's Request for Review. (Tr. 4-6). It noted that the "additional evidence" submitted by Plaintiff was considered, and it concluded that such evidence did "not provide a basis for changing the [ALJ's] decision." (Tr. 4-5). The additional evidence is not substantively discussed by the Appeals Council. Plaintiff contends that the Appeals Council's failure to articulate its reasoning makes it impossible to apply the "egregious mistake" standard.

While Plaintiff's point has some appeal at first blush, it is exposed as flawed when you look closely at the First Circuit's reasoning in Mills. In Mills, the First Circuit recognized that an Appeals Council denial of a request for review has all the "hallmarks" of an unreviewable, discretionary decision. Mills, 244 F.3d at 5. The Appeals Council is given a great deal of latitude under the regulations and "need not and often does not give reasons" for its decisions. Id. Thus, the First Circuit "assume[d] that the Appeals Council's refusal to review would be effectively unreviewable if no reason were given for the refusal." Id. at p. 6. It did, however, create a narrow exception for review when the Appeals Council "gives an egregiously mistaken ground for [its] action." Id. at p. 5. The First Circuit did not find this result to be a "serious anomaly" because "there is reason enough to correct an articulated mistake even though one cannot plumb the thousands of simple 'review denied' decisions that the Appeals Council must issue every year." Id. at p. 6. Plaintiff's argument is basically an attempt to turn the narrow Mills rule inside/out.

Kirby, 2008 WL 2787926, at *10 (alterations in original); see also Mills, 244 F.3d at 6; Jette v. Astrue, C.A. No. 07-437A,

2008 WL 4568100, at *18 (D.R.I. Oct. 14, 2008).

In the instant case, the Appeals Council denied review using the same "boiler plate" language cited above, namely that the new information did "not provide a basis for changing the [ALJ's] decision." (R. at 5)  The Court cannot say that this is an "egregiously mistaken ground," Mills, 244 F.3d at 5, for declining to review the ALJ's decision, see Kirby, 2008 WL 2787926, at *10.  Accordingly, I recommend that Plaintiff's final claim of error be rejected.

### Summary

In summary, the Court finds: 1) that the ALJ failed to evaluate the opinions of Plaintiff's treating physicians (Drs. Barratt and Kent) appropriately and failed to state the weight he gave to those opinions and to the opinion of the ME, thereby committing legal error; 2) that the ALJ's finding that Plaintiff's complaints regarding the intensity, persistence, and limiting effect of his pain were not entirely credible is not supported by substantial evidence; and 3) that the Appeals Council's denial of review was not erroneous.

### Conclusion

For the reasons stated above, I find that the ALJ erred in his evaluation the opinions of Plaintiff's treating physicians and in failing to state the weight which he gave to those opinions and to the opinion of the ME.  I additionally find that the ALJ's conclusion regarding Plaintiff's credibility with respect to the intensity, persistence, and limiting effect of his pain is not supported by substantial evidence.  Accordingly, I recommend that Plaintiff's Motion to Reverse be granted to the extent that the matter be remanded for further administrative proceedings.  I further recommend that Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be

27

specific and must be filed with the Clerk of Court within ten
(10) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv
72(d).  Failure to file specific objections in a timely manner
constitutes waiver of the right to review by the district court
and of the right to appeal the district court's decision.  <u>See</u>
<u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986);
<u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st
Cir. 1980).

<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
August 27, 2009